# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| DEANNA BUITRON, ex rel., A.B., a minor, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 2:11-cv-409 |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Deanna Buitron, on behalf of her minor son A.B., appeals the Social Security Administration's decision to deny his application for disability insurance benefits. An administrative law judge found that A.B. was not disabled within the meaning of the Social Security Act. As explained in detail below, I find that the ALJ failed to make a proper credibility determination as to A.B. and his mother and will therefore remand this matter.

## BACKGROUND

**1. Medical Evidence**

The medical evidence in this case paints a portrait of A.B. as a teenager struggling with his concentration and emotions. As outlined below, the experts analyzing A.B. were generally trying to determine the extent of A.B.'s limitations within the six "domains" listed in the regulations of the Social Security Administration. These domains are hopelessly subjective and overly general but for better or worse they are what determine whether a teenager is merely rebellious and possibly a bit immature versus one who is disabled and therefore entitled to

1

benefits. The domains ask how a child does at: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for oneself; and 6) health and physical well-being. 20 C.F.R. § 416.926a(a), (b)(1).

In November 2009, when A.B. was fourteen years old, he underwent a psychological consultative examination at the request of Disability Determination Services. A.B. reported that he did poorly in school because he did not pay attention and engaged in horseplay. [R. 238.] He also admitted to giving his teachers a lot of "back talk." [R. 240.] The psychologist diagnosed attention deficit hyperactive disorder ("ADHD") and oppositional defiant disorder ("ODD"). [*Id.*]

A.B. received psychiatric services from Porter-Starke Services (a social welfare agency) beginning in November 2009. A November 2009 initial evaluation revealed that A.B. had been in fights, threatened people, disobeyed teachers, made threatening gestures to teachers, and hit kids in school. [R. 251.] The examiner reported in the mental status examination that A.B. was restless as the session progressed, his affect was mostly flat, he spoke quietly in low tones, his insight was very poor, and his judgment and impulse control were poor. [R. 253.] A.B. was diagnosed with ADHD predominately hyperactive and impulsive type, adjustment disorder with disturbance of conduct, and ODD. [R. 252.]

Treatment notes from later that month indicated that A.B. felt calmer since he tried the medication Vyvanese, although he did have another incident in school. [R. 255.] His mother still thought he seemed restless on the medication. [*Id.*] On the mental status examination A.B. had poor eye contact and his affect was irritated. [*Id.*] In December 2009 A.B. was doing well

2

in school, but had put his friend in a choke hold after the friend unplugged his computer, and he later hit walls and cursed. [R. 265.] A few days later A.B. put holes in a door because his mother came in his room. [*Id.*]

A Disability Determination Services doctor and psychologist opined in November and December 2009 that A.B. had less than marked limitations in the domains of attending and completing tasks and interacting and relating with others, and no limitations in the other domains. [R. 277-78.] At the same time, A.B.'s ninth-grade English teacher indicated on a questionnaire sent by Disability Determination Services that A.B. had multiple suspensions. In the domain of attending and completing tasks, the teacher stated A.B. had serious daily problems changing from one activity to another without being disruptive and working without distracting himself or others, obvious daily problems focusing long enough to finish assigned activity or task, refocusing to task when necessary, and carrying out multi-step instructions, and the teacher wrote that "[A.B.] needs almost continuous redirection in class to stay focused and on task." [R. 153, 155.] In the domain of interacting and relating with others, the teacher stated that A.B. had obvious problems seeking attention appropriately and expressing anger appropriately and wrote that A.B. occasionally walked around the area to burn off steam and settle down. [R. 156.] In the domain of caring for himself, the teacher stated that A.B. had obvious problems handling frustration appropriately, using good judgment regarding personal safety and dangerous circumstances, responding appropriately to changes in own mood, and using appropriate coping skills to meet daily demands of school environment, and the teacher wrote that "[A.B.] has poor impulse control and often acts on his emotions without thinking about consequences." [R. 158.] The teacher did state, however, that A.B.'s performances were much better on the days he took

3

his medication. [R. 159.]

In January and February of 2010, a Disability Determination Services doctor and psychologist opined that A.B. had a marked limitation in interacting and relating with others, less than marked limitations in attending and completing tasks and caring for himself, and no limitations in the other domains. [R. 292-93.]

In March 2010 A.B. was not having behavioral problems at school but at home was having mood swings, crying a lot, cussing, yelling, losing his temper and being violent to his brother. [R. 299.] He was also pushing and punching his mother, had threatened to kill her, and told her he would blow up the house if he was put in the hospital. [*Id.*] He did, however, feel like his medication had helped his grades and behavior at school. [*Id.*] On the mental status examination A.B.'s mood was depressed and affect tearful repeatedly and the doctor indicated he was still very labile and reactive at home. [R. 300.] In April 2010 A.B. was doing "really well" in school, but had gotten into a fight once in the last couple of months and kept saying he was going to kill someone when he was upset with them. [R. 302.] On examination A.B. was angry and sullen about having to wait for the appointment, his mood was frustrated and affect weary and angry. [R. 303.]

In June 2010 the ALJ sent Dr. Biscardi, a psychological expert, A.B.'s file and a letter asking for his opinion regarding A.B.'s impairments and limitations. Dr. Biscardi opined that A.B. had marked limitations in attending and completing tasks and caring for himself, and a less than marked to marked limitation in interacting and relating with others. [R. 316-17.] The doctor wrote that Listings 112.11 for ADHD and 112.08 for ODD were clearly documented with marked limitations in attending and completing tasks and caring for himself, as reported by

4

A.B.'s teacher and suggested in the medical evidence of record. [R. 319.]

That same month (June 2010), A.B. was in summer school and almost got expelled and suspended for truancy. [R. 331.] He was irritable and still having some mood swings – he admitted to "flipping out for no good reason." [*Id.*] In August 2010 A.B. and his family had not noticed a difference since his medication Depakote was increased. [R. 334.] In October 2010 A.B.'s irritable mood continued, he admitted to getting mad very easily, and he was focusing poorly in school despite taking Vyvanese in the morning. [R. 336.] The doctor indicated that A.B. was having problems with impulsivity and judgment and that his ADHD issues were still not quite treated. [R. 337.]

In January 2011 A.B. had knocked holes in his mother's doors and was getting suspended repeatedly for truancy. [R. 321.] He was doing worse despite taking his medications and the Vyvanese being increased. [*Id.*] A.B. was getting bad grades in school, feeling very agitated and eating poorly. [*Id.*] The doctor noted on examination that A.B.'s affect was bland and he looked thinner, and she assessed that A.B. was not doing well and his anger was out of control again. [R. 322.] In February 2011 A.B. was "improving esp around irritability." [R. 324.] He was still irritable (though it was "better"), his grades were barely passing, and he continued to have a low mood. [R. 323.] In March 2011 A.B.'s mother left a message reporting that A.B. had been suspended from school twice, was being disrespectful to his teachers, had tried to hit his mother, had put his hand to his head like a gun, and was refusing to take his medications a majority of the time. [R. 325.] In an April 2011 visit A.B. reported he had 21 incidents of disrespect to a teacher recently, and he started having more impulsivity and mood swings in the previous month in spite of being on Zyprexa. [R. 345.] On examination A.B.'s speech was

5

mumbling, his mood irritable and judgment poor. [R. 346.]

**2. Testimony at Hearing**

A.B. testified at the hearing that had been suspended many times and had problems with a teacher at his school. [R. 37.] He did not really pay attention in school because he was both unable to and chose not to. [R. 38.] He fought with his friends and teachers on a daily basis even with taking his medication. [R. 40, 43.] He had threatened to harm people, including his mother and brother. [R. 47.] He took his psychiatric medications but not on weekends because he wanted to stay up with friends. [R. 37.] He felt that the medications did not help him and that he still got into a lot of trouble at school even with the medication. [R. 42.] He had changed medications a few times but none worked for him. [R. 44.]

A.B.'s mother testified at the hearing that A.B. did not cooperate with taking his medications on the weekends, that he was not yet stabilized on the medications, and that she did not notice an improvement on the medications. [R. 49 - 52.] He also had fits and rages, knocked holes in doors and walls, and was easily upset and would fight with friends. [*Id.*] He called her names, screamed at her, and pushed her several times. [R. 53.]

**3. ALJ's Decision**

As detailed in his decision, the ALJ found that A.B. had severe impairments of amblyopia of the right eye, ADHD, ODD, and bipolar disorder; he did not have an impairment or combination of impairments that met or equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1; and he did not have an impairment that functionally equaled one of the listings. [R. 14.] The ALJ further found, pursuant to the standard six-domains analysis

alluded to above and discussed more below, that A.B. had a marked limitation in interacting and relating with others, a less than marked limitation in attending and completing tasks and in the ability to care for himself, and no limitations in acquiring and using information, moving about and manipulating objects, and health and physical well being. [R. 19-26.] Since A.B. did not have an impairment or combination of impairments that caused marked limitations in two functional domains or an extreme limitation in one functional domain, the ALJ found that he was not disabled under the Social Security Act. [R. 27.]

## ANALYSIS

Unless there is an error of law, the Court will uphold the Commissioner's findings of fact if they are supported by substantial evidence in the record. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Even if reasonable minds could differ as to the appropriate conclusion, as long as the ALJ's decision is supported by substantial evidence, it should be upheld. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). In evaluating the decision, the Court's "role is extremely limited." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

A child is disabled under the Act if he has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Whether a child meets this definition is determined via a multi-step inquiry. 20 C.F.R. § 416.924(a); *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); *Giles v. Astrue*, 483 F.3d 483, 486–87 (7th Cir. 2007). At the outset, if the child is engaging in substantial gainful activity, his claim will be denied. *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 486. Next, if he does not have a medically

severe impairment or combination of impairments, his claim will be denied. *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 486. Finally, the child's claim will be denied unless his impairment meets, or is medically or functionally equivalent to, one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 486–87.

As noted earlier, the determination of functional equivalency involves a further analysis of the child's condition in the context of six "domains" or categories, from an age-appropriate standpoint: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for oneself, and 6) health and physical well-being. 20 C.F.R. § 416.926a; *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487. A child's impairment is functionally equivalent to the listings, meaning the child qualifies for benefits, if the ALJ finds she has marked difficulty in two domains of functioning or an extreme limitation in one. 20 C.F.R. § 416.926a(a); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487. A marked limitation is one which interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i); *Giles*, 483 F.3d at 487. It is further defined as "more than moderate, but less than extreme," and can be demonstrated by standardized test "scores that are at least two, but less than three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i). An extreme limitation is present where the results of a standardized test are three or more standard deviations below the norm for the test, or when an impairment interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(3).

The ALJ in this case found that A.B. had no limitations in three of the domains (acquiring and using information, moving about and manipulating objects, and health and

physical well being) and had a marked limitation in one domain (interacting and relating with others). Buitron does not challenge any of those four findings. Instead, Buitron takes issue with the ALJ's findings in the two other domains (attending and completing tasks and in the ability to care for oneself). For those two domains, the ALJ found that A.B. did have limitations but that they were less than marked.

Buitron challenges those findings in a number of ways that can be grouped into three general categories: 1) credibility, 2) opinion evidence, and 3) overall substantial evidence. First, with respect to credibility, Buitron argues that the ALJ failed to analyze the credibility of A.B. and his mother in reaching his less-than-marked conclusions. Second, with respect to the opinion evidence, Buitron argues that the ALJ failed to properly analyze the opinion testimony of his ninth-grade English teacher and of the non-testifying medical expert and also should have sought out the advice of another medical expert. Lastly, Buitron argues that the ALJ's less-than-marked conclusions were not supported overall by substantial evidence. As explained in detail below, I am persuaded by Buitron's argument regarding the ALJ's credibility analysis and will thus remand the case on that ground.

A credibility finding by the ALJ is a part of every social security disability case and credibility findings should generally be express and reasoned. *See Giles*, 483 F.3d at 488; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). The ALJ has to make a specific determination as to the credibility of a claimant; the determination cannot be implied. *Giles*, 483 F.3d at 489; *Brindisi v. Barnhart*, 315 F.3d 783, 788 (7th Cir. 2003); *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003). Here, the ALJ summarized the testimony of A.B. and his mother, but did not indicate whether he believed them. The Commissioner argues that by summarizing the

testimony the ALJ considered "relevant factors to the assessment of credibility" and that thus "the ALJ's credibility determination was not patently wrong." [DE 21 at 11.]

The problem with the Commissioner's argument, however, is that there simply was no credibility determination whatsoever. In *Giles*, the ALJ did what the ALJ did here: recited some of the testimony but failed to make a credibility assessment. *Giles*, 483 F.3d at 488–89. The court found that the ALJ was obligated to make a finding as to credibility one way or the other. *Giles*, 483 F.3d at 489. "If [the] testimony was not credible, the ALJ was obligated to explain the basis of that assessment. If, on the other hand, [the] testimony was credible, the ALJ was required to explain why the testimony did not support a finding that [the claimant] was markedly limited in attending and completing tasks." *Id.* at 489. That's the problem here: the ALJ failed to explain whether he found the testimony of A.B. and his mother credible. Accordingly, this matter must be remanded to the Commissioner so that a credibility determination can be made.

Given that the case is being remanded on the credibility issue, I need not address Buitron's other arguments. *Eskew v. Astrue*, 462 Fed. App'x. 613, 615 (7th Cir. 2011) (given the court's remand on one of claimant's arguments, it "need not address [her] remaining arguments"); *Craig v. Astrue*, 269 Fed. App'x. 710, 713 (9th Cir. 2008) ("Because the ALJ's faulty assessment of [plaintiff's] credibility requires remand, we need not address her remaining arguments."). Once the credibility issue is addressed on remand, the ALJ is encouraged to revisit, as he sees appropriate and necessary, his evaluations of the opinions offered by A.B.'s ninth-grade English teacher and by the non-testifying medical expert as well as his conclusions regarding the level of A.B.'s limitations with respect to attending and completing tasks and caring for himself.

## CONCLUSION

While mindful of the difficult case load faced by ALJs and the professionally prepared opinion which I have reviewed here, the Commissioner's decision must be remanded for consideration of the credibility of the testimony of A.B. and his mother. The final decision of the Commissioner is, therefore, **REMANDED** for further proceedings consistent with this opinion.

**SO ORDERED**.

ENTERED: December 20, 2012

s/ Philip P. Simon  
PHILIP P. SIMON, CHIEF JUDGE  
UNITED STATES DISTRICT COURT